IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BAXALTA INCORPORATED and BAXALTA GMBH, | ) ) ) | PUBLIC VERSION |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 17-509-TBD |
| GENENTECH, INC. and CHUGAI PHARMACEUTICAL CO., LTD., | ) ) ) | ███████████████ |
| Defendants. | ) ) ) | |

**GENENTECH'S MEMORANDUM OF LAW IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

ASHBY & GEDDES
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Of Counsel:*

Kenneth A. Gallo
David E. Cole
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
2001 K. Street, NW
Washington, D.C. 20006-1047
(202) 223-7300

Nicholas Groombridge
Eric Alan Stone
Jennifer Gordon, Ph.D.
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

Dated: May 15, 2018

*Attorneys for Defendant Genentech, Inc.*

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

Table of Authorities ...................................................................................................... iii

I. INTRODUCTION ................................................................................................1

II. STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS..................2

III. SUMMARY OF ARGUMENT ............................................................................2

IV. COUNTERSTATEMENT OF FACTS ...............................................................3

    A.       Hemophilia and Its Pre-HEMLIBRA Treatments .................................3

    B.       The Development of HEMLIBRA.............................................................4

            1.      The Clotting Cascade .................................................................4

            2.      Antibodies ..................................................................................4

            3.      The Development of Emicizumab ..............................................5

    C.       The Clinical Trial Results with Emicizumab.............................................6

    D.       The Reaction to HEMLIBRA ...................................................................7

    E.       Baxalta's Work Leading to the '590 Patent..............................................8

    F.       The Japanese Lawsuit Between Baxalta and Chugai.................................9

    G.       This Motion, and Baxalta's Public Statements at Odds with It ..............10

V. ARGUMENT .....................................................................................................11

    A.       The Public Interest:  An Injunction Would Deprive Inhibitor Patients of a Valuable, Long-Sought Treatment, One That Baxalta Itself Cannot Provide ....................................................................................................12

            1.      Baxalta's "Carve-Outs" Either Render Its Injunction Meaningless or Imperil Patient Safety .........................................................13

            2.      There Is No Basis in Law or Science To Enjoin Sales to the Non-Inhibitor Population .........................................................14

    B.       Irreparable Harm: Baxalta's Harm Can Be Remedied with Money, and Laches Bars Any Finding of Irreparable Injury.....................................15

            1.      Baxalta Is Not Experiencing "Price Erosion" at All, Much Less of the Kind Courts Recognize as Irreparable .................................15

            2.      Baxalta's Reputation Is Not at Risk Here.................................17

            3.      Baxalta's Delay in Bringing and Lethargic Prosecution of This Motion Precludes a Finding of Irreparable Harm .....................18

    C.       Likelihood of Success: Baxalta Has Not Shown That it Is Likely To Prove Infringement or Overcome Genentech's Evidence That Claim 1 Is Invalid ........19

1. Baxalta Is Not Likely To Prove Infringement Because Emicizumab Is Not an "Antibody or Antibody Fragment" Within the Claims ..............20

2. Genentech Has Raised a Substantial Question of Invalidity Under Section 112....................................................................................................21

D. Balance of the Equities:  The Harm to Genentech in Restructuring Its Business Outweighs the Harm to Baxalta of Losing Sales....................23

VI. THE BOND REQUIREMENT ........................................................................25

VII. CONCLUSION..............................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AbbVie Deutschland GmbH & Co.* v. *Janssen Biotech, Inc.*,
759 F.3d 1285 (Fed. Cir. 2014)..................................................................21, 23

*Amazon.com, Inc.* v. *Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001)..................................................................19, 20

*Amgen Inc.* v. *Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017)..................................................................21, 23

*Ariad Pharm., Inc.* v. *Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) (en banc).............................................................21

*Bard Peripheral Vascular, Inc.* v. *W.L. Gore & Assocs., Inc.*,
No. CV-03-0597-PHX-MHM, 2009 WL 920300 (D. Ariz. Mar. 31, 2009) ..........................12

*Bianco* v. *Globus Med., Inc.*,
No. 12-CV-00147, 2014 WL 1049067 (E.D. Tex. Mar. 17, 2014) ........................................12

*Cordis Corp.* v. *Bos. Sci. Corp.*,
99 F. App'x 928 (Fed. Cir. 2004) ...............................................................12, 13

*Edge Sys. LLC* v. *Aguila*,
635 F. App'x 897 (Fed. Cir. 2015) ...............................................................2, 18

*Eli Lilly & Co.* v. *Am. Cyanamid Co.*,
82 F.3d 1568 (Fed. Cir. 1996)...............................................................11

*Graceway Pharms., LLC* v. *Perringo Co.*,
697 F. Supp. 2d 600 (D.N.J. 2010) ...............................................................18, 19

*Kimberly-Clark Worldwide, Inc.* v. *Tyco Healthcare Grp. LP*,
635 F. Supp 2d. 870 (E.D. Wis. 2009)...............................................................12, 13

*Luminara Worldwide, LLC* v. *Liown Elecs. Co.*,
814 F.3d 1343 (Fed. Cir. 2016)...............................................................11

*Nat'l Steel Car, Ltd.* v. *Can. Pac. Ry., Ltd.*,
357 F.3d 1319 (Fed. Cir. 2004)...............................................................2, 19

*Neuromedical Sys., Inc. v. Neopath, Inc.*,
No. 96-civ-5245-JFK, 1998 WL 264845 (S.D.N.Y. May 26, 1998)........................................12

*SCA Hygiene Prods. Aktiebolag* v. *First Quality Baby Prods., L.L.C.*,
807 F.3d 1311 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 954 (2017)...................18

# TABLE OF AUTHORITIES
## (Continued)

Page(s)

*Sciele Pharma Inc.* v. *Lupin Ltd.*,
   684 F.3d 1253 (Fed. Cir. 2012)...........................................................................2, 19

*Scripps Clinic & Research Found.* v. *Genentech, Inc.*,
   666 F. Supp. 1379 (N.D. Cal. 1987) ........................................................................12

*Winter* v. *Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008).....................................................................................1, 11, 17

*Wreal, LLC* v. *Amazon.com, Inc*,
   840 F.3d 1244 (11th Cir, 2016) ................................................................................19

## STATUTES

35 U.S.C. § 112....................................................................................2, 20, 21, 23

## OTHER AUTHORITIES

Fed. R. Civ. P. 65....................................................................................................25

# I.    INTRODUCTION

"Now that I am taking HEMLIBRA®, I know that I can go to school, I can pursue my career, and I can pursue the life that I want. ... I can look to the future for the first time. Everything just changed for me. It really is like a whole new life."
*-- Harvey Liverman, living with hemophilia A with an inhibitor*

"I want the Court to hear our story, because I hope that other families can have their lives changed by HEMLIBRA® the way it has changed our family's life. I ask the Court to please not prevent anyone from getting access to this life-changing medicine."
*-- Chelsey Serrano, mother of two boys with hemophilia A with inhibitors*

HEMLIBRA® is revolutionary.  Before HEMLIBRA, hemophilia patients with inhibitors endured multiple infusions per week, yet many still suffered joint deformities and poor prognoses. HEMLIBRA offers easy, weekly injections with unparalleled efficacy.  It has been praised by doctors, patients, and industry groups. ██████████████████████████

Yet Baxalta seeks to enjoin sales of HEMLIBRA, thus imperiling patient safety and quality of life, just to make more money.  Baxalta's motion finds no basis in law or equity, and thus Baxalta cannot prove any of the injunction prerequisites.  *See Winter* v. *Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  **(1)  The public interest** is harmed by barring patients from a more effective (and less expensive) therapy. ████████████████████████████ ██████████████████████    **(2)**  Baxalta faces **no irreparable harm**; lost sales can be remedied with money, and Baxalta's delay in filing and prosecuting this motion bars equitable relief.  **(3**) Baxalta has **no likelihood of success on the merits**.  It will lose this lawsuit, at summary judgment or trial, on both non-infringement and invalidity.  And **(4) the balance of equities** topples in Genentech's favor:  Genentech would need to fundamentally rework its business to comply with Baxalta's Proposed Order, while outside of Court Baxalta admits it does not really want this injunction.  Baxalta publicly declared that "clinicians and their patients need to have access to all available therapies."

Genentech agrees, and respectfully requests that the Court deny this motion.

## II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Baxalta sued on May 4, 2017.  Baxalta did not file this motion for another seven months.

[D.I. 41.]  A hearing is set for June 13 and 14, 2018.  [D.I. 95 ¶ 7.]  Trial is set for September 2019.

The patent, U.S. Patent No. 7,033,590 [D.I. 1-1], expires in December 2021.

## III.    SUMMARY OF ARGUMENT

1.    **The Public Interest Bars an Injunction**.  HEMLIBRA is already bringing an unprecedented quality of life to a needy patient population.  Baxalta concedes patients' needs are not met by the existing therapies, and cannot assure the Court that patients will not bleed or suffer dire consequences if this motion were granted.  The public interest commits treatment decisions to patients and their doctors, not to Baxalta.

2.    **Baxalta Faces No Irreparable Harm**.  Money can remedy Baxalta's damages from HEMLIBRA sales.  And Baxalta's delay in filing and torpor in prosecuting this motion bars equitable relief.  *See Edge Sys. LLC* v. *Aguila*, 635 F. App'x 897, 907 (Fed. Cir. 2015).

3.    **Baxalta Is Not Likely To Succeed on the Merits**.  Emicizumab, the active ingredient in HEMLIBRA, is not an "antibody or antibody fragment" as the specification and prosecution history define those terms, and thus Baxalta cannot "show that it will likely prove that [Genentech] infringes" Claim 1 of the '590 Patent.  *Sciele Pharma Inc.* v. *Lupin Ltd.*, 684 F.3d 1253, 1259 (Fed. Cir. 2012).  Separately, the patent claims a broad genus of antibodies, but Baxalta's scientists developed only a scant handful of antibodies showing activity so miniscule that they could never be (and never were) developed into a hemophilia treatment.  There is far more than a "substantial question" about the validity of claim 1 under 35 U.S.C. § 112, precluding injunctive relief.  *Nat'l Steel Car, Ltd.* v. *Can. Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004).

4.    **The Balance of Hardships Favors Genentech**.  Baxalta faces no hardship if it

loses this motion. Outside of Court, Baxalta has been vocal about not wanting to keep HEMLIBRA away from patients. Genentech, on the other hand, would have to radically restructure its business if the injunction were granted, and compliance might still be impossible.

## IV.   COUNTERSTATEMENT OF FACTS

Genentech draws these facts from the declarations of Gallia Levy, M.D., Ph.D. [D.I. 98], Harvey Liverman [D.I. 99], Gina Chapman [D.I. 100], Greg Hogan [D.I. 102], Chelsey Serrano [D.I. 104], Jerry Hausman, Ph.D. [D.I. 108], Michael Callaghan, M.D. [D.I. 109], Guy Young, M.D. [D.I. 110], John Sheehan, M.D. [D.I. 111], William Strohl, Ph.D. [D.I. 112], and David E. Cole [D.I. 153] and the exhibits thereto.

### A.   Hemophilia and Its Pre-HEMLIBRA Treatments

People with hemophilia A make defective or insufficient Factor VIII, a component of the "clotting cascade" by which bleeding stops. [D.I. 46 ¶ 14.] The conventional treatment, intravenous infusion of Factor VIII several times a week, is effective but burdensome. [*Id.*; D.I. 109 ¶¶ 8-9, 15.] About 30% of patients with severe hemophilia A develop antibodies to Factor VIII (known as "inhibitors") that render Factor-VIII-replacement therapy ineffective. [D.I. 46 ¶ 15.] While Factor VIII inhibitors can sometimes be overcome through a difficult, protracted process known as "Immune Tolerance Induction," it often fails and many patients do not try or do not complete it. [D.I. 110 ¶ 22.] These patients are known as the "inhibitor population."

Until HEMLIBRA was approved last November, the inhibitor population had few good therapeutic options. [D.I. 109 ¶¶ 16-29; D.I. 110 ¶¶ 21-30.] The '590 Patent itself noted, in 1999, that "Treatment of Factor VIII inhibitor patients is very difficult and involves risks, and so far there exist only a limited number of treatments for these patients." [D.I. 1-1 at 1:32-35.] Inhibitor patients could take one or both of two "bypass agents" that help clots form without Factor VIII: NovoSeven® and Baxalta's FEIBA®. Both are taken either on-demand in response to bleeding

episodes, or prophylactically several times a week, and each dose requires a lengthy intravenous infusion. [D.I. 109 ¶¶ 19-21; D.I. 110 ¶¶ 25, 29.] Both therapies impose "considerable limitations and suboptimal efficacy" and "negatively impact[] quality of life." [D.I. 109 ¶ 18; D.I. 110 ¶ 29.] While the '590 Patent noted the need for a better treatment for inhibitor patients [D.I. 1-1 at 2:23-25], no such treatment emerged in the next 18 years, until HEMLIBRA.

## B.    The Development of HEMLIBRA

Emicizumab, the antibody in HEMLIBRA, replaces Factor VIII in the clotting cascade.

### 1.    The Clotting Cascade

The clotting cascade involves coagulation "Factors," each assigned a Roman numeral. Most Factors circulate in an inactive form and are activated in the clotting cascade. [D.I. 111 ¶ 35.] Activated Factors are identified by adding "a" to their name. *Id.* An important part of the clotting cascade occurs when Factor VIIIa interacts with Factor IXa and the two complex with Factor X, allowing Factor IXa to activate Factor X. [*Id.* ¶ 38; D.I. 111-8 at 1571.]

### 2.    Antibodies

Antibodies are part of the immune system. [D.I. 112 ¶ 22.] To use the patent's definition:

> Antibodies are immunoglobulin molecules having a specific amino acid sequence which only bind to antigens that induce their synthesis (or its immunogen, respectively) or to antigens (or immunogens) which are very similar to the former. Each immunoglobulin molecule consists of two types of polypeptide chains. Each molecule consists of large, identical heavy chains (H chains) and two light, also identical chains (L chains).

[D.I. 1-1 at 5:56-63.] In the 1970s, scientists developed a method for creating monoclonal antibodies to a known antigen called the "hybridoma" approach. The '590 Patent inventors used this approach. [*Id.* at 9:62-10:37.] Monoclonal antibodies created in laboratories exhibiting desirable properties have come to be used for therapeutic use, for testing applications, and in research. Antibodies produced by B-lymphocytes, and antibodies made from them by the hybridoma method, are "monospecific": They bind to only one antigen. [D.I. 112 ¶ 50.]

### 3. The Development of Emicizumab

Emicizumab, however, is "bispecific": One arm of its Y shape binds to Factor IXa, and the other binds to Factor X. [D.I. 112 ¶¶ 52-53.] Scientists at Chugai conceived of the idea of designing an antibody that would substitute for Factor VIII and serve its scaffold function. That is, it would bind to Factor IXa and Factor X in exactly the right places to hold them in spatial proximity and allow Factor IXa to activate Factor X without Factor VIIIa:



[D.I. 111-8 at 1571.]

Ex post facto descriptions make things sound easy. Developing emicizumab was anything but easy, as Genentech's expert Dr. Strohl explains. [D.I. 112 ¶¶ 182-195.] Using an antibody as a scaffold to bring together an enzyme and its substrate was unorthodox. The Chugai scientists who developed emicizumab went through three rounds of development, immunizing mice, rabbits, and rats; taking additional candidate antibodies from libraries of mouse, rabbit, and human antibodies; creating around 200 hybridomas producing antibodies to Factor IXa or Factor X; screening 40,000 possible combinations of antibodies to find only 94 candidates in the last round of development; and overcoming setback after setback. [*See id.*] As Dr. Strohl testifies, this was worse than the proverbial needle in a haystack: "there was <u>no guarantee</u> that there <u>was</u> a 'needle' to be found in the 'haystack.'" [*Id.* ¶ 186.] After years without finding a lead candidate, Chugai scientists then engineered and refined the antibody to create emicizumab, altering its light and heavy chains to improve therapeutic activity and ease of manufacture. For example, emicizumab

has two different heavy chains (one binding Factor IXa and one binding Factor X) but its light chains are identical. [*Id.*] The common light chain is not the product of a hybridoma, but is genetically engineered to have binding sites for *both* Factor IXa and Factor X. [*Id.* ¶ 186.]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████ [*Id.* ¶ 194.] Dr. Strohl has managed or overseen more than 40 drug-discovery programs in his career, and he has "never had even one program that was this incredibly complex or high risk." [*Id.* ¶ 195.] "This was a monumental and heroic effort." [*Id.*]

The ingenuity of emicizumab has been well recognized. The development of a bispecific antibody to Factors IX and X was published in *Nature Medicine.* [*See* D.I. 111-8.] An editorial in that same issue described emicizumab as "an entirely different approach to overcoming FVIII deficiency." (Cole Decl. Ex. 9 at GNE-00062669.) The antibody-engineering techniques that Chugai tested, employed, and in some instances, pioneered, were themselves important enough to be published in two technical journals. [D.I. 112-8; Cole Decl. Ex. 10; D.I. 112 ¶¶ 182-195.]

###### C. The Clinical Trial Results with Emicizumab

Patient results are what matter. And the results have been breathtaking. In even the Phase I clinical trial, patients saw their Annualized Bleed Rate (or "ABR") of more than 30 bleeds per year drop to an unprecedented median ABR of 0.0 on emicizumab. The results warranted publication in *The New England Journal of Medicine.* (*See* Cole Decl. Ex. 11.) On the basis of that Phase I trial, FDA granted emicizumab "Breakthrough Therapy" status. [D.I. 98 ¶ 10.]

Genentech and its corporate parent, Roche Holdings Ltd, then conducted Phase III clinical trials—the HAVEN 1 and HAVEN 2 trials—in adult and adolescent hemophilia A patients with Factor VIII inhibitors. [*Id.* ¶¶ 6-8.] Again, the results were extraordinary. As reported again in *The New England Journal of Medicine,* inhibitor patients who received no prophylaxis had an

ABR of 23.3 for bleeds requiring treatment, while patients who received emicizumab had an ABR of 2.9, a statistically significant difference of 87%.  (Cole Decl. Ex. 12 at 4.)  The median ABR for patients taking emicizumab was again 0.0.  (*Id.*)  And in an intra-individual comparison, the ABR of patients who previously used bypass agents prophylactically and switched to emicizumab dropped from 15.7 to 3.3, again with a median ABR of 0.0 with emicizumab.  (*Id.*)

On the strength of these data, FDA approved HEMLIBRA® for "routine prophylaxis to prevent or reduce the frequency of bleeding episodes in adult and pediatric patients with hemophilia A (congenital Factor VIII deficiency) with Factor VIII inhibitors." [D.I. 46-14 at 2.]

Genentech and Roche are conducting additional clinical trials—HAVEN 3 and HAVEN 4—studying HEMLIBRA in the non-inhibitor population and the effectiveness of every-four-week dosing.  [D.I. 98 ¶ 9.]  While the results are not yet public, Roche announced in November—before Baxalta filed this motion, but conspicuously absent from Baxalta's moving papers—that the HAVEN 3 study showed "a statistically significant and clinically meaningful reduction in treated bleeds in an intra-patient comparison of patients receiving Hemlibra prophylaxis compared to their prior Factor VIII prophylaxis."  (Cole Decl. Ex. 13.)  FDA has granted Breakthrough Therapy status for Genentech's application for HEMLIBRA in the non-inhibitor population.  (*Id.* Ex. 14.)

### D.    The Reaction to HEMLIBRA

The unprecedented clinical-trial results with HEMLIBRA have been borne out in practice. Harvey Liverman, who has hemophilia A with an inhibitor, and Chelsey Serrano and Greg Hogan, the parents of young boys with hemophilia A and inhibitors, have submitted declarations in opposition to Baxalta's motion relating the night-and-day change in their lives since they began to use HEMLIBRA.  [*See* D.I. 99; D.I. 104; D.I. 102.]  Frequent bleeding has been replaced by long periods of no bleeds at all.  Three- or four-times-weekly, hour-long intravenous infusions have been replaced by a weekly injection like an insulin shot.  Hours lost to treatment have been re-

devoted to family life, to work, to anything but having to deal with hemophilia.

Dr. Guy Young and Dr. Michael Callaghan were principal investigators in the HAVEN 1 and HAVEN 2 clinical trials, and each is a coauthor on the 2017 paper in *The New England Journal of Medicine*. They have both attested to seeing astonishing results in their patients on HEMLIBRA. [*See* D.I. 110 ¶¶ 37-53; D.I. 109 ¶¶ 46-65.] As one example, of many:

> I care for a 15 year old with a long-standing inhibitor and limited social support who had been on FEIBA®, infused through a port-a-cath 3 times weekly. He had a regular home nurse who came to his house, and had been hospitalized 11 times in the past 12 months. The hospital's residents all knew him by name. After he started HEMLIBRA he was able to have his catheter line removed. In 2 years on HEMLIBRA, he has had one minor bleed, has begun playing basketball with his friends, and has stayed out of the hospital.

[D.I. 109 ¶ 57.]

The importance of HEMLIBRA is also well recognized by the hemophilia community. Patient-advocacy groups submitted a Citizens Petition to FDA expressing "immediate concern" over Baxalta's preliminary injunction motion, which they described as "a threat to patients who, like ourselves, need better therapies." (Cole Decl. Ex. 15 at 1.) And the independent Institute for Clinical and Economic Review ("ICER") concluded that HEMLIBRA "improves patient outcomes," improves quality of life, improves school attendance and work attendance, lowers caretaker burdens, and "lowers treatment costs" by comparison to existing treatments for the inhibitor population. (Cole Decl. Ex. 16 at 1-2; *see generally* Ex. 17.)

### E.  Baxalta's Work Leading to the '590 Patent

Baxalta filed the priority application leading to the '590 Patent in 1999, noting that there was a significant need for better treatments for the inhibitor population. [D.I. 1-1 at 2:22-25.] To be clear, Baxalta's FEIBA® existed in 1999, and is referenced in the patent. (*Id.* at 1:56-60.) Yet Baxalta announced the need for a treatment better than FEIBA. And it never found one.

In the ultimately-dead-end work leading to the '590 Patent, Baxalta's scientists generated

antibodies to Factor IX/IXa via the hybridoma approach.  The '590 Patent does not disclose how many such antibodies Baxalta's scientists created, but ████████████████████████ ████████  [D.I. 111 ¶¶ 76-107.]  A very small number, however, appeared to demonstrate "Factor VIII-like" activity or to show a mild increase in the "procoagulant activity of Factor IXa" under certain unusual conditions.  [D.I. 1-1 at *e.g.*, 9:11-25.]

In the '590 Patent, Baxalta's scientists claimed the individual antibodies to Factor IX/IXa that they purportedly had found to have a procoagulant effect.  They identified some of those antibodies by the amino-acid sequence of their binding regions and claimed them to ensure that no one else could use those specific antibodies.  [*Id.* at Claims 5, 6, 7, 8, 9, 10, 11.]  More broadly, however, they also claimed <u>any</u> "isolated antibody or antibody fragment thereof that binds Factor IX or Factor IXa and increases the procoagulant activity of Factor IXa."  [*Id.* at Claim 1.]  Only that broad genus claim is currently at issue on this motion.[1]

Notably, nothing ever came of Baxalta's experiments.  Baxalta has never marketed an antibody to Factor IX or Factor IXa for treating hemophilia, tried to bring one to market, or even tested one in a clinical trial.  [D.I. 14 ¶¶ 88-91.]  And Baxalta has never sought to enforce the '590 Patent against any companies other than Chugai and Genentech.  [*Id.* ¶ 93.]

### F.  The Japanese Lawsuit Between Baxalta and Chugai

Baxalta sued Chugai in Tokyo in April of 2016, asserting a Japanese counterpart to the '590 Patent and seeking a permanent injunction preventing export of emicizumab out of Japan and destruction of the existing inventory.  Baxalta lost.  The Japanese court ruled that emicizumab did not infringe similarly-worded claims.  (Cole Decl. Ex. 18 at 38.)  During that lawsuit, Chugai

---

[1]  Baxalta initially sought this injunction under Claims 1-4, 15, and 19-20. [D.I. 42.]  Some three months later, Baxalta narrowed its motion to Claim 1, without explanation [D.I. 106].

argued that the patent was anticipated by four prior-art antibodies to Factor IX that inherently possess procoagulant activity within the scope claimed by Baxalta's patent. Baxalta reacted by "correcting" its Japanese patent to exclude those four prior-art antibodies (*id.* at 2-3), an option permitted in Japan but unavailable in the United States.

### G. This Motion, and Baxalta's Public Statements at Odds with It

In ███████████████████████████████████████████████
██████████████████████████████████████████████. [D.I. 43-1, Ex. M at BXLACE_0001067.] ███████████████████████████████
██████████████████████████████████████████ [D.I. 43-1, Ex. JJ at BXLACE_0001200.] But Baxalta did not sue until May, and did not seek a preliminary injunction or mention preliminary injunctive relief in its Complaint [D.I. 1], in the Civil Cover Sheet [D.I. 1-14], in the Joint Status Report, in the Amended Joint Status Report, in the Proposed Scheduling Order, or in the Amended Proposed Scheduling Order [D.I. 15; D.I. 16; D.I. 17; D.I. 30-1].

Baxalta lay in wait. When FDA approved HEMLIBRA on November 16, 2017, Baxalta again did nothing. It moved for a preliminary injunction only nearly a month later. [D.I. 41.] Its explanation was that Baxalta had not expected approval until February 2018 and had not known for what indication the product would be approved. [D.I. 58 at 12-13.] ███████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████. [*See* D.I. 43-1, Ex. M at BXLACE_0001067.]

Then, when it finally brought this motion, Baxalta told the market to ignore it. Shire issued a press release saying that "Until the court's decision on the motion for the preliminary injunction is made, expected summer 2018, there will be no patient impact." (Cole Decl. Ex. 19 at 2.) Shire did not explain why it did not seek faster adjudication. And Shire revealed that what it really

wanted was money: "Shire has a long track record of successfully resolving U.S. patent issues, and after over two years of discussions with Roche, we are optimistic and confident that this intellectual property matter will now have an accelerated resolution." (*Id.*)



(Cole Decl. Ex. 1 at 170:6-9.)

(Cole Decl. Ex. 20 at BXLACE_0437737.)

. (Cole Decl. Ex. 20 at BXLACE_0437735.)

(Cole Decl. Ex. 2 at 148:19-22.) Shire then stated, for attribution, that it believes "clinicians and their patients need to have access to all available therapies." (Cole Decl. Ex. 17 at 130.)

Genentech agrees. As the facts and the law confirm, the Court should deny this motion.

## V.    ARGUMENT

A preliminary injunction is an "'extraordinary'" remedy. *Eli Lilly & Co.* v. *Am. Cyanamid Co.*, 82 F.3d 1568, 1578 (Fed. Cir. 1996). Baxalta must prove that it "'is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Luminara Worldwide, LLC* v. *Liown Elecs. Co.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016) (quoting *Winter*, 555 U.S. at 20). Baxalta cannot prove any of these factors.

**A.    The Public Interest:  An Injunction Would Deprive Inhibitor Patients of a Valuable, Long-Sought Treatment, One That Baxalta Itself Cannot Provide**

Courts deny applications for preliminary injunctions that could adversely affect public health.  *See Bianco* v. *Globus Med., Inc.*, No. 12-CV-00147, 2014 WL 1049067, at *11 (E.D. Tex. Mar. 17, 2014) (collecting cases).  The public interest supports "eschewing interference with physician choice and preferring a wide array of treatment options." *Kimberly-Clark Worldwide, Inc.* v. *Tyco Healthcare Grp. LP*, 635 F. Supp 2d. 870, 882 (E.D. Wis. 2009); *see*, *e.g.*, *Cordis Corp.* v. *Bos. Sci. Corp.*, 99 F. App'x 928, 935 (Fed. Cir. 2004) (non-precedential) (a "strong public interest supports a broad choice of" medicines).  In *Neuromedical Sys., Inc.* v. *Neopath, Inc.*, the court refused an injunction that could have negatively affected early detection and treatment of cervical cancer.  *See* No. 96-civ-5245-JFK, 1998 WL 264845, at *16 (S.D.N.Y. May 26, 1998).  In *Bard Peripheral Vascular, Inc.* v. *W.L. Gore & Assocs., Inc.*, the court rejected an injunction that would "deny many sick patients a full range of clinically effective and potentially life saving treatments."  No. CV-03-0597-PHX-MHM, 2009 WL 920300, at *9 (D. Ariz. Mar. 31, 2009).  And in a hemophilia case, the court denied a preliminary injunction because hemophilia patients "could suffer" from "any delay" in a recombinant Factor VIII treatment.  *Scripps Clinic & Research Found.* v. *Genentech, Inc.*, 666 F. Supp. 1379, 1401 (N.D. Cal. 1987).

HEMLIBRA offers advantages over the existing treatments for hemophilia A patients with inhibitors.  Genentech's experts Dr. Young and Dr. Callaghan detail the tremendous success their patients have seen on HEMLIBRA.  [D.I. 110 ¶¶ 37-53; D.I. 109 ¶¶ 46-65.]  Declarations from families and a patient confirm this.  [D.I. 99, 102, 104.]  Genentech's expert Dr. Hausman testifies that because HEMLIBRA is priced at approximately half of FEIBA's cost per year, the "consumer surplus" represented by HEMLIBRA is itself a reason that the public interest disfavors an injunction.  [D.I. 108 ¶¶ 26, 62-66.]  And ICER independently confirmed that HEMLIBRA is more

effective and less expensive than existing treatments. (Cole Decl. Ex. 16 at 1.)

Yet Baxalta proposes to bar some patients from receiving the less expensive, more effective treatment that they and their physicians prefer. There is a "legitimate public interest in allowing physicians to have as wide a variety of options as is possible." *Kimberly-Clark*, 635 F. Supp. 2d at 882; *Cordis*, 99 F. App'x at 934. None of Baxalta's arguments renders its injunction equitable.

1.     **Baxalta's "Carve-Outs" Either Render Its Injunction Meaningless or Imperil Patient Safety**

Baxalta tries to blunt the impact of the outright ban on sales of HEMLIBRA to hemophilia A patients with inhibitors in Paragraph 3 of its Proposed Order with a complicated "carve-out" in Paragraph 4(a), (b), and (c) for patients "whose needs are not currently being met" by the existing treatments. [D.I. 42-1 at 2.] That includes anyone who has taken HEMLIBRA before (in clinical trials or commercially) (¶ 4(a)), and anyone who is currently using bypass agents (NovoSeven or Baxalta's FEIBA) prophylactically (or on demand, having previously failed on prophylaxis) ████ ████████████████████████████████████████████ or has life- or limb-threatening bleeding in the absence of external trauma, or cannot receive an in-dwelling port or catheter through which to infuse bypass agents (¶¶ 4(b)(ii), (iii), 4(c)(ii)). Three aspects of this carve-out are noteworthy:

**First**, it is essential to Baxalta's motion. ███████████████████████████████ ████████████████████████████████████████████████████████████████. (Cole Decl. Ex. 3 at 199:20-24.) ████████████████████████ ████████████████████████████. (*Id.* at 307:19-310:9.)

**Second**, it is gibberish. ████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████. (*Compare* Cole Decl. Ex. 3 at 228:19-230:14, 292:4-25, 294:24-295:9, 296:22-297:14, 299:8-10, *with* Ex. 1

at 149:14-152:10; Ex. 4 at 112:8-118:11.)

**Third**, it is dangerous. The Proposed Order requires patients newly diagnosed with an inhibitor to try bypass-agent therapy before they may take HEMLIBRA.  Entrusting patient safety to Divine Providence is not in the public interest.

### 2. There Is No Basis in Law or Science To Enjoin Sales to the Non-Inhibitor Population

In paragraph 6 of its Proposed Order, Baxalta asks the Court to enjoin sales of HEMLIBRA to the non-inhibitor population, *i.e.*, patients who can be treated with Factor VIII. FDA has not approved HEMLIBRA for the non-inhibitor population, and off-label marketing is forbidden. Genentech's Hemophilia Practice Head, Gina Chapman, testified that Genentech is not marketing HEMLIBRA to the non-inhibitor population and will not do so unless and until FDA approves it

for that population [D.I. 100 ¶ 17]. There is no ripe controversy, and nothing to enjoin. Moreover, there is no evidentiary basis for an injunction: ███████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████. (Cole Decl. Ex. 3 at 332:21-333:23.)

**B.** **Irreparable Harm: Baxalta's Harm Can Be Remedied with Money, and Laches Bars Any Finding of Irreparable Injury**

HEMLIBRA will take sales away from Baxalta's bypass agent, FEIBA. ████████

███████████████████████████████████ (*Accord* D.I. 108

¶¶ 22, 32-37; D.I. 43 ¶¶ 64-84.) But those losses are compensable with money. Trial is currently set for September, 2019, and the '590 Patent expires two years later. [D.I. 108 ¶ 30.] If Baxalta wins, damages before trial and during the remaining patent life are readily calculable, and compensable. [*Id.*] █████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████. (Cole Decl. Ex. 5 at 69:13-73:14, 162:1-163:4.)[2] Further, Baxalta's proposed injunction will not prevent the harm it fears: Under its Proposed Order, HEMLIBRA will still take sales away from FEIBA. [D.I. 108 ¶ 38.]

**1.** **Baxalta Is Not Experiencing "Price Erosion" at All, Much Less of the Kind Courts Recognize as Irreparable**

Baxalta first claims it must lower its prices to compete with HEMLIBRA, and that such "price erosion" is irreparable harm. [D.I. 42 at 17-18.] Baxalta is wrong for four reasons.

**First**, there is no evidence of "price erosion" for FEIBA even though HEMLIBRA has

---

[2] ████████████████████████████████████████████████████
████████████(Cole Decl. Ex. 5 at 68:23-81:11.)████████████
██████████████████████████████. (*Id.* at 162:1-163:4.)

been on the market for six months. 

(Cole Decl.
Ex. 5 at 26:14-30:4, 123:9-19, 147:19-148:21; D.I. 43-1, Ex. M at BXLACE_0001067, BXLACE_0001085; D.I. 43-1, Ex. EE at BXLACE_0001139; D.I. 43-1, Ex. PP at BXLACE_0001148).

**Second**, Baxalta's injunction would not prevent price erosion. [D.I. 108 ¶¶ 45-49.] Baxalta is not trying to bar HEMLIBRA from the market altogether,

(Cole Decl. Ex. 5 at
62:8-23, 67:6-16, 82:14-83:12.)

**Third**, the price-erosion theory recognized by the cases is that absent a preliminary injunction, the infringer will come on the market and sell at a discount, requiring the innovator to drop its own prices to compete, and that once the innovator wins at trial and excludes the infringer from the market, the innovator will not be able to re-raise its own prices. That theory presupposes the availability of a permanent injunction that excludes the infringer from the market. But Baxalta is not trying to exclude HEMLIBRA from the market altogether.

**Fourth**, any price erosion from HEMLIBRA would soon be inevitable. When the '590 Patent expires two years after trial, HEMLIBRA would enter the market no matter how this motion or the trial is resolved. As Dr. Hausman testifies, without contradiction, whether price erosion occurs in 2018, 2019, or 2021, it is calculable and remediable. [D.I. 108 ¶¶ 44-49.]

## 2.    Baxalta's Reputation Is Not at Risk Here

Baxalta also relies on cases finding irreparable harm where a generic or copycat enters the market with an infringing product and consumers might—wrongly—perceive the innovator as less innovative. [D.I. 42 at 18.] But Baxalta has not tried to meet its evidentiary burden here. It has not offered testimony from a percipient witness about Baxalta's supposed reputation for innovation, maintaining market exclusivity, and enforcing its patent, and has not subjected that witness to cross-examination. *Winter*, 555 U.S. at 21-22 ("possibility" of irreparable harm is insufficient; the movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction"). Instead, Baxalta relies on an expert's predictions of harm to Baxalta's unsubstantiated reputation. [*Id.* (citing D.I. 43 ¶¶ 85-90).] And there is significant evidence that Baxalta either has no such reputation or faces no harm to it from HEMLIBRA:

**Reputation as an Innovator**: Baxalta does not sell—and has never sold—a product that practices the '590 Patent. ████████████████████████████████████████████████
████████ (Cole Decl. Ex. 3 at 388:10-14.) When Shire bought Baxalta, Shire's Chief Executive said that Baxalta "had been a bit starved" for innovation. (Cole Decl. Ex. 24.) After HEMLIBRA's development became public, Shire licensed a company called Novimmune's bispecific-antibody technology, suggesting that Baxalta lacked the capability to create a bispecific antibody that binds Factor X and Factor IXa on its own. (Cole Decl. Ex. 25 at 1.)

**Reputation for Enforcing Market Exclusivity**: There is a good reason no Baxalta employee has testified that Baxalta must protect its market exclusivity for the '590 Patent. Baxalta has no exclusivity to maintain: Baxalta does not have a product that practices the '590 Patent, and there is no evidence that anyone ever asked—or that Baxalta ever refused—to license that patent.

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████. (Cole Decl. Ex. 20.)

**Reputation for Enforcing Intellectual Property Rights**: Finally, Mr. Bakewell claims that that denial of an injunction "could signal" that Baxalta does not enforce its intellectual property rights. [D.I. 43 ¶ 88.] This is pure speculation unsupported by percipient testimony. And Baxalta offers no explanation for why filing patent-infringement lawsuits in this Court and Japan are insufficient to sustain the "tough guy" image it apparently covets.

### 3. Baxalta's Delay in Bringing and Lethargic Prosecution of This Motion Precludes a Finding of Irreparable Harm

Laches bars claims for preliminary injunctive relief where the movant delays in asserting its rights, the delay was "not excusable," and the delay causes the defendant "undue prejudice." *Edge Sys.*, 635 F. App'x at 907; *Graceway Pharms., LLC* v. *Perringo Co.*, 697 F. Supp. 2d 600, 605 (D.N.J. 2010). The facts giving rise to laches suggest a lack of irreparable injury (and a balance of the equities favoring the non-movant). *SCA Hygiene Prods. Aktiebolag* v. *First Quality Baby Prods., L.L.C.*, 807 F.3d 1311, 1331 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 954 (2017).



. (Cole Decl. Ex. 5 at 38:1-39:18, 99:7-100:7.)

. (Cole Decl. Ex. 5 at 102:21-104:4, 105:19-106:24, 108:17-23 & D.I. 43-1, Ex. JJ at BXLACE_0001200.) Yet Baxalta did not take steps to avoid the alleged harm about which it now complains. It sued in May 2017 but deliberately never mentioned—and did not seek—a preliminary injunction until nearly seven months later, a month after HEMLIBRA launched. And Baxalta agreed to schedule the preliminary injunction for seven months later.

(*Id.* at 66:8-67:23.)

Baxalta could have moved for an injunction when it filed suit and could have asked for a hearing at or near the time of HEMLIBRA's launch. It did neither. Genentech, on the other hand, created and mobilized an internal organization to commercialize HEMLIBRA. Now, Baxalta proposes an injunction that (as described in the declaration of Gina Chapman and below in the balance-of-equities section) would require Genentech to radically redesign that business.

Laches bars Baxalta's prayer for equity. Baxalta dallied, whether one measures Baxalta's delay ██████████████████████████████, or from filing suit in May, or from Genentech's June announcement that it had filed for FDA approval, or from FDA approval in November. In *Wreal*, five months' delay supported laches. *See Wreal, LLC* v. *Amazon.com, Inc*, 840 F.3d 1244, 1248 (11th Cir. 2016). In *Graceway*, the delay was "one day short of a full calendar month." 697 F. Supp. 2d at 606-07.

### C. Likelihood of Success: Baxalta Has Not Shown That it Is Likely To Prove Infringement or Overcome Genentech's Evidence That Claim 1 Is Invalid

Baxalta must show that it "will likely prove" infringement of Claim 1 and that its "infringement claim will likely withstand" Genentech's challenges to the validity of the patent. *Sciele Pharma*, 684 F.3d at 1259 (citing *Amazon.com, Inc.* v. *Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)). If Genentech "raises a substantial question concerning either infringement or validity, *i.e.*, asserts an infringement or invalidity defense that the patentee cannot prove lacks substantial merit, the preliminary injunction should not issue." *Nat'l Steel Car*, 357 F.3d at 1325. Furthermore, "'[v]ulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial. The showing of a substantial question as to invalidity thus requires less proof than the clear and convincing showing necessary to establish invalidity itself' at trial."

*Id.* at 1335 (quoting *Amazon.com*, 239 F.3d at 1359).[3]

### 1. Baxalta Is Not Likely To Prove Infringement Because Emicizumab Is Not an "Antibody or Antibody Fragment" Within the Claims

Claim 1 claims an "isolated antibody or antibody fragment." [D.I. 1-1 at 101:43.] As Genentech's expert Dr. William Strohl testifies [D.I. 112 ¶¶ 34-38, 45-102], Baxalta cannot prove infringement because emicizumab is not an antibody or an antibody fragment as the patent and prosecution history define those terms. The patent defines an "antibody" as having four polypeptide chains, consisting of two "identical heavy chains . . . and two light, also identical chains." [D.I. 1-1 at 5:56-64.] Emicizumab is an antibody derivative, and specifically, a bispecific antibody with two nonidentical heavy chains. ████████████████████████████████

████████████████████ it has full-length heavy and light chains. (Cole Decl. Ex. 6 at 137:17-24.)

Claim 1 in the initial patent application claimed an antibody or "antibody derivative." [D.I. 112-4 at GNE-00001757.] The Examiner twice rejected that claim as not enabled for all antibody derivatives, a category in which the Examiner included bispecific antibodies. [D.I. 112 ¶¶ 80-86.] ████████████████████████████████████████████████

████████████████████ as does the Cao & Suresh paper cited in the patent, and as does Baxalta's expert in Japan, Dr. Kontermann. [D.I. 112 ¶¶ 73-97; D.I. 112-10 at BXLACE_0032020; D.I. 112-09 at GNE-00001793; D.I. 112-16 at GNE-00001846.] During prosecution, at the Examiner's request, Baxalta deleted "antibody derivative" and inserted "antibody fragment," surrendering non-enabled antibody derivatives, including bispecific antibodies, from the scope of the claim. [D.I. 112-14 at GNE-00001833; D.I. 112-15 at GNE-00001839.] Thus, HEMLIBRA®,

---

[3]  These claims are invalid as anticipated, obvious, indefinite, and lacking enablement and written description. Because a substantial question as to even one basis for invalidity bars injunctive relief, Genentech focuses here on Section 112.

which contains the bispecific antibody derivative emicizumab as its active ingredient, does not infringe the '590 Patent, either literally or under the doctrine of equivalents.

### 2. Genentech Has Raised a Substantial Question of Invalidity Under Section 112

Claim 1 covers a broad genus: "An isolated antibody or antibody fragment thereof that binds Factor IX or Factor IXa and increases the procoagulant activity of Factor IXa." As Genentech's expert Dr. Sheehan will testify (*see* D.I. 111 ¶¶ 76-107; *see also* D.I. 112 ¶¶ 196-228), there is more than a substantial question of whether the patent supports that broad claim.

For an antibody genus claim to satisfy the written description requirement, "a patentee may disclose either a representative number of species falling within the scope of the genus or disclose structural features common to the genus so that one of skill in the art can visualize or recognize the members of the genus." *Amgen Inc.* v. *Sanofi*, 872 F.3d 1367, 1375-76 (Fed. Cir. 2017) (internal citations omitted).



(Cole Decl. Ex. 7 at 168:3-14.)

. (*Id.* at 98:10-101:13, 102:5-106:14, 110:18-114:11.)

. (*Id.* at 110:18-114:11.) That is, Baxalta has not even tried to satisfy the structure/function approach countenanced by *Amgen,* by *AbbVie Deutschland GmbH & Co.* v. *Janssen Biotech, Inc.*, 759 F.3d 1285 (Fed. Cir. 2014), and by *Ariad Pharm., Inc.* v. *Eli Lilly & Co.*, 598 F.3d 1336 (Fed. Cir. 2010) (en banc).

Instead, Baxalta seeks to claim the genus by identifying a representative number of species. But the genus is vast, particularly regarding the magnitude of the antibodies' increase in the

procoagulant activity of Factor IXa. That scope is boundless. ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████ (Cole Decl. Ex. 8 at 146:15-20; *see*

*also* D.I. 112 ¶¶ 71-73.) ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ (Cole Decl. Ex. 8 at 146:15-22, 155:17-156:3; Ex. 6 at 194:18-22.)

Dr. Sheehan, Genentech's expert, reviewed the '590 Patent's disclosures about the ability

of the '590 antibodies to clot blood in both standard and modified "aPTT" assays (a type of

coagulation assay). The '590 Patent discloses no antibody that clots blood in a standard aPTT

assay. [D.I. 111 ¶¶ 77, 107.] ████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████ [D.I. 111 ¶ 98.] The patent provides data for only one antibody,

193/AD3, in a modified aPTT assay. [D.I. 1-1 at 16:45-17:67; *see also* D.I. 111 ¶¶ 78-87.] Two

other antibodies, 198/A1 and 198/B1, are mentioned as having aPTT activity similar to that of

193/AD3, but no data are provided. [D.I. 1-1 at 18:60-61.] And the increased clotting activity of

these antibodies is exceedingly slight, and then only when tested under artificial conditions.

[D.I. 111 ¶ 81.] From the scant data provided, Dr. Sheehan has concluded that the antibodies of

the '590 Patent display "procoagulant" activity no better than the clotting ability of Factor VIII in

a person with severe hemophilia. [*Id.* ¶ 85.] Thus, while claim 1 encompasses antibodies with

therapeutically useful levels of procoagulant activity, including activity equivalent to that of Factor

VIII in normal blood, no species disclosed in the '590 Patent come even close to being able to

"increase the procoagulant activity of Factor IXa" in a clinically meaningful way. [*Id.* ¶¶ 87, 107.]

Yet Baxalta accuses emicizumab, a clinically useful hemophilia agent, of infringement. The Court may consider the accused product to determine (a) the scope of the claim and (b) whether the patentee was in possession of a species that would support claim scope broad enough to encompass the accused product. *See Amgen*, 872 F.3d at 1373-75; *Abbvie*, 759 F.3d at 1298-1302. The '590 Patent provides no written description of a bispecific antibody that recognizes Factor IX/IXa with one "arm" and Factor X with its other "arm" (as emicizumab does), and no antibodies described in the '590 Patent even approach emicizumab's level of procoagulant activity.

To defeat an injunction, Genentech need only raise a substantial question as to patent validity. There is far more than a substantial question of invalidity here. The '590 Patent is invalid for failure to comply with Section 112. [D.I. 111 ¶¶ 76-119; D.I. 112 ¶¶ 103-228.] No skilled artisan would conclude that the inventors were in possession of the broadly worded, functional genus that they claimed. Had a skilled artisan had access to the data withheld from the USPTO, those data would confirm this conclusion all the more. [D.I. 111 ¶¶ 96-99.]

### D. Balance of the Equities: The Harm to Genentech in Restructuring Its Business Outweighs the Harm to Baxalta of Losing Sales

This is Baxalta's desultory balance-of-the-equities argument: Because Baxalta has sold hemophilia drugs for years and HEMLIBRA is Genentech's first hemophilia product, competition will hurt Baxalta more than delaying HEMLIBRA sales until after trial would hurt Genentech.

Baxalta's argument collapses for lack of evidence. Baxalta has not put in a declaration from (and thus cannot call at the hearing) a single employee to attest to Baxalta's purported harm, whereas Genentech's Gina Chapman and Gallia Levy, M.D., Ph.D. testified about the work that went into securing approval for and marketing HEMLIBRA. [*See* D.I. 100; D.I. 98.]

Baxalta also fundamentally misstates the harm it seeks to wreak. The Proposed Order would forbid Genentech from selling or offering to sell HEMLIBRA to inhibitor patients outside

Baxalta's carve-out and to all non-inhibitor patients. Complying with that order would be extremely difficult, if not impossible. As Gina Chapman explained, "Genentech does not sell directly to patients," and thus has "no existing means to comply with such an order." [D.I. 100 ¶ 12.] Genentech sells HEMLIBRA "to pharmaceutical distributors and authorized specialty pharmacies in bulk, which then sell it to pharmacies," and sells a very small amount directly to Hemophilia Treatment Centers, also "in bulk and . . . not designated for a particular patient." [Id. ¶ 8.] Genentech does not know the identity—and certainly not the ABR or medical history—of the patients who take HEMLIBRA. [Id. ¶ 10.] Genentech would have to create a system to collect, review, vet, and keep confidential the medical information that would determine whether a patient could or could not receive HEMLIBRA. As Ms. Chapman testified, the "problems with this approach are not merely monetary and technological." [Id. ¶ 16.] The burden on doctors to provide this information will reduce resources available for treatment. Id. Patients may well be turned away from HEMLIBRA altogether by the prospect of disclosing confidential information to a pharmaceutical company. [Id.; see also Cole Decl. Ex. 2 at 40:4-9, 60:1-62:17.]

On the other side of the balance is . . . nothing. Shire told the public that it hoped that this motion would bring Roche to the bargaining table. (Cole Decl. Ex. 19.) ████████████ ██████████████████████████████████████ (Cole Ex. 20 at BXLACE_0437737, 043735.) ██████████████████████████████████████████████████████ ████████████████. (Cole Decl. Ex. 1 at 170:6-9.) And Shire officially told ICER, for attribution, that Shire believes that "clinicians and their patients need to have access to all available therapies." (Cole Decl. Ex. 17 at 130.) The balance of equities tips away from granting Baxalta an injunction that, in every place but this courthouse, it has declared it does not want.

## VI.     THE BOND REQUIREMENT

Baxalta has not addressed the requirement of a bond. *See* Fed. R. Civ. P. 65(c). Genentech does not waive the bond requirement, and submits that if the Court grants this motion the parties should brief the amount of an appropriate bond before any injunction takes effect.

## VII.     CONCLUSION

For the foregoing reasons, the Court should deny Baxalta's motion.

ASHBY & GEDDES

*/s/ Steven J. Balick*

_____
Steven J. Balick (#2114)
Andrew C. Mayo (#5207)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashbygeddes.com
amayo@ashbygeddes.com

*Of Counsel:*

Kenneth A. Gallo
David E. Cole
PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
2001 K. Street, NW
Washington, D.C. 20006-1047
(202) 223-7300

Nicholas Groombridge
Eric Alan Stone
Jennifer Gordon, Ph.D.
PAUL, WEISS, RIFKIND, WHARTON &
   GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
(212) 373-3000

*Attorneys for Defendant Genentech, Inc.*

Dated: May 15, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of May, 2018, the attached **GENENTECH'S**

**MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A**

**PRELIMINARY INJUNCTION** was served upon the below-named counsel of record at the

addresses and in the manner indicated:

Colm F. Connolly, Esquire                          VIA ELECTRONIC MAIL
MORGAN, LEWIS & BOCKIUS LLP
1007 North Orange Street, Suite 501
Wilmington, DE 19801

Michael J. Abernathy, Esquire                     VIA ELECTRONIC MAIL
MORGAN, LEWIS & BOCKIUS LLP
77 West Wacker Drive, Fifth Floor
Chicago, IL 60601

Jessica A. Stow, Esquire                           VIA ELECTRONIC MAIL
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103

John W. Shaw, Esquire                              VIA ELECTRONIC MAIL
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801

David C. Doyle, Esquire                            VIA ELECTRONIC MAIL
MORRISON & FOERSTER LLP
12531 High Bluff Drive, Suite 100
San Diego, CA 92130

*/s/ Steven J. Balick*
_____
Steven J. Balick